O. L. GREGORY VINEGAR COMPANY v. NATIONAL FRUIT CANNING COMPANY.

## Opinion delivered January 26, 1925.

1. TRIAL—INSTRUCTION IGNORING ISSUE.—In an action by a seller to recover the price of fruit juice sold for use in making vinegar, where the defense was that the juice contained an excessive amount of saline solution, it was error to give an instruction that defendant was liable though the juice contained salt or other substances rendering it unfit for use in making vinegar.

2. TRIAL—INSTRUCTION IGNORING ISSUE.—In an action by a seller to recover the price of fruit juice sold for use in making vinegar an instruction ignoring issues and permitting the seller to recover, even though the juice contained an excessive amount of salt rendering it unfit for making vinegar, if the juice was extracted in the customary manner, was erroneous.

3. SALES—IMPLIED WARRANTY.—In a sale of fruit juice to be used in making vinegar there is an implied warranty that the juice is suitable for that purpose, unless the purchaser actually inspected the method by which the juice was to be extracted or was advised as to such method.

4. SALES—IMPLIED WARRANTY.—Where a manufacturer undertakes to supply goods manufactured by himself to be used for a particular purpose, and the vendee has not had an opportunity to inspect the goods, there is an implied warranty that the article to be furnished is reasonably fit for the purpose for which it is intended.

5. SALES—IMPLIED WARRANTY—OPPORTUNITY OF INSPECTION.—The purchaser of an article to be manufactured for a specific purpose is not denied the benefit of the implied warranty that it is fit for the intended purpose merely because he may have had an opportunity to inspect the process of manufacture, but, if the purchaser does in fact inspect the article purchased and knows at the time he makes the contract what the article is to be, there is no implied warranty.

6. Pleading—time of making amendment.—It was within the trial court's discretion to permit an amendment of a pleading after the trial had commenced.

7. Sales—breach of contract—counterclaim.—In an action by a seller to recover the agreed price, the buyer could counterclaim any damages which proximately resulted from the seller's breach of contract.

Appeal from Sebastian Circuit Court, Fort Smith, District; *John E. Tatum,* Judge; reversed.

*James B. McDonough,* for appellant.

*Hill & Fitzhugh,* for appellee.

There is no warranty of the fitness of goods, express or implied, if the goods are inspected by the buyer, or if he has an opportunity to inspect the same and fails to do so, unless he is fraudulently imposed upon. 35 Cyc. 410 and cases cited in notes. This court has adopted that rule. 74 Ark. 144 and authorities cited.

Where a known defined article is ordered of a manufacturer, and he furnishes such article, there is no implied warranty. Here the commodity purchased was well known, and was defined in the contract, the method of manufacture described. 35 Cyc. 403.

McCulloch, C. J. Appellee is a corporation operating an industrial plant at Seattle, Washington, engaged in canning fruit, and this is an action instituted in the circuit court of Sebastian County (Fort Smith District) to recover the price of a quantity of fruit juice sold to appellants under written contract. Appellants are engaged in making, and selling vingar at Paris Texas, and Rogers, Arkansas, and the contract between the parties for the sale of the fruit juice is, omitting the caption, as follows:

"The following goods are hereinafter provided:

"Material: Apple juice as pressed from the cores, peelings and waste from the apples used by the National Fruit Canning Company.

"Quantity: Estimated 50,000 gallons, with the understanding that it shall be more or less, depending upon the quantity, if any, that may be pressed by the

seller in addition to the contract which the seller has already made with Bergoust Davies Co.

"Purpose: Not for beverage purposes, for vingar making.

"Price: Eight cents (8c) per gallon net f. o. b. Seattle, loaded in cars 60,000 lbs. each or more.

"Period: As soon as buyer can provide barrels for filling not later than November 25, 1921, and shipments to start not later than December 1. Expense of delivering barrels for filling shall be borne by the buyer, who is also to pay for the dunnage.

"Terms: Net cash. Sight draft against bill of lading."

Appellee shipped to the Ozark Cider & Vinegar Company, at Rogers, Arkansas, on the order of appellants, under this contract, four carloads of apple juice, containing about 27,000 gallons, and this suit is to recover the price specified in the contract. The shipment was received at Rogers, but it was found on examination, according to the claim of appellants, that the juice contained salt solution in quantities sufficient to interfere with the manufacture of vinegar, and appellants refused to pay for same, and stored it in tanks at Rogers, to be held for appellee.

Appellants' defense in the action is that the fruit juice tendered and delivered was not in accordance with the specifications of the contract, and that there was a breach of the contract in failing to furnish juice suitable for the manufacture of vinegar. Appellants tendered a counterclaim for damages on account of the price of barrels furnished to appellee and converted, also for the amount of freight paid on the four carloads shipped, and also for the loss of profits on the contract alleged to have been broken by appellee.

The amount sued for was $3,003.34 but, on the trial of the issue, the jury returned a verdict for $1,740.84, being the amount claimed in the complaint after deducting the value of 505 barrels furnished by appellants to

appellee in addition to those used in the shipment of the four carloads.

The evidence discloses in detail the method used by appellee and other fruit-canners in preparing apples for canning and for extracting the juice to be used for other manufacturing purposes. According to the evidence adduced by appellee, the apples were first peeled and cored and then dropped into barrels of water containing a small percentage of salt for the purpose of preventing the apples from turning brown; the apples were allowed to remain in the water about fifteen minutes, and were then taken out and cut into halves or quarters, and then "trimmed" by removing bruised spots and particles of skin left on the apples in process of peeling. The particles trimmed in the manner and for the purposes indicated go into what is termed the waste, and, together with the peelings and cores, are used in obtaining juice for other manufacturing purposes. The juice is usually sold for use in making vinegar, and it will be noticed that the contract involved in this controversy expressly provided that the juice sold under the contract was for vinegar-making and not for beverage purposes.

There is a sharp conflict in the testimony as to the extent of the salt permeation in the juice sold and delivered to appellants. The testimony of witnesses introduced by appellee tends to show that there was a very low percentage of salt in the solution, which did not interfere with the making of vinegar, whilst, on the other hand, the testimony adduced by appellants tended to show that the extent of the salt solution was 48 per cent. of the whole. One of the witnesses for appellant put the percentage at .376, and testified that this percentage prohibited the use of the juice for making vinegar. Witnesses testified that the juice shipped to appellants was not normal, either in taste or color, and that the taste of salt was so strong that it could not be used in making vinegar.

The testimony shows that the contract was entered into after Mr. Maury Robinson, one of the appellants, had visited appellee's plant at Seattle. There is a conflict as to the extent of Robinson's inspection of appellee's plant and method of operation. A witness introduced by appellee testified that Robinson inspected the whole plant, and knew the precise process under which the fruit juice was extracted, as well as the substances from which it was extracted. Robinson ttstified that, on his visit to the plant, he did not inspect the particular method of extracting the juice and did not know that any portion of the substances from which the juice was extracted had been immersed in salt water.

The court gave many instructions, at the instance of both parties, and gave the following, among others, at the request of appellee, over the objection of appellants:

"5. The contract provided for the sale of apple juice pressed from cores, peelings and waste from the apples used by the National Fruit Canning Company. If you believe from the evidence in this case that the apple juice tendered by the plaintiff to the defendant. vinegar company was juice as pressed from the cores, peelings and waste from the apples used by the plaintiff company, then you should find for the plaintiff, although you may believe from the evidence that said juice contained salt or other substances.

"6. If you believe from the evidence in this case that plaintiff adopted the usual and ordinary method generally prevailing in that part of the country in extracting juice from the cores, peelings and waste of its apples, and that it was usual and ordinary in that part of the country to drop the apples in a brine solution after they had been peeled and cored, and then to trim the waste parts of such apples and extract the juice from such cores, peelings and waste, and that such usual and ordinary method was adopted by the plaintiff with reference to this juice, and that the juice tendered was

extracted in such usual and ordinary method, then your verdict should be for the plaintiff fruit company, although you may further believe from the evidence that such juice contained an excessive amount of salt.''

We are of the opinion that instruction No. 5, copied above, was an incorrect statement of the law as applied to the issues in the case, and was, in fact, of a peremptory nature. It was prejudicial to appellants, and calls for a reversal of the judgment.

It is the contention of learned counsel for appellee that the contract between the parties was, in effect, one for the purchase of a certain commodity, the quality and price of which was agreed upon, and which the purchaser had an opportunity to inspect, and did inspect. We do not so interpret the contract, and our conclusion is that it was a contract for the sale of a commodity for a particular purpose. At any rate, instruction No. 5, quoted above, ignores the issue in the case as to whether or not the juice actually furnished by appellee was fit for use in making vinegar. The instruction ignored all questions as the character of the juice, and told the jury that, if it was apple juice that was pressed from the cores, peelings and waste from the apples used by appellee, then the latter was entitltd to recover, ''although you may believe from the evidence that said juice contained salt or other substancs.'' It is undisputed that the juice shipped by appellee was pressed from the cores, peelings and waste'' used in appellee's cannery, but there was a conflict in the testimony as to the extent to which the liquid was permeated by solution of salt and the extent to which the salt interfered with the making of vinegar. Testimony adduced by appellants tended to show that the juice was 48 per centum salt solution, and that it could not be used for making commercial vinegar, and yet this instruction told the jury that, regardless of the fact that the juice contained salt or other substances, appellee was entitled to recover if the juice in question was extracted from the ''cores, peelings and waste''

used by appellee in its cannery. The instruction was obviously erroneous and was, of course, prejudicial.

Instruction No. 6 was also erroneous in ignoring the other issues in the case and in telling the jury that, if it was customary to drop the apples into a brine solution after being peeled and cored and the juice involved in this case was extracted in that manner, appellee would be entitled to recover, even though the juice contained an excessive amount of salt.

It is true that the court gave numerous instructions at the request of appellants, but these two instructions were in direct conflict with those given at the request of appellants. For instance, the court gave instruction No. 3, at the request of appellants, as follows:

"If the jury find from the evidence that the plaintiff shipped and tendered on said contract apple juice which contained salt or brine in such a per cent. as would interfere with the making of vinegar, then the plaintiff did not tender the products agreed to be sold, and if the juice tendered contained too much salt solution and was not the juice described in the contract, then the plaintiff broke the contract, and would not be entitled to recover."

The court also gave instruction No. 5, as follows:

"The contract expressly provides that the juice is to come from cores, peelings and waste 'from apples used by the National Fruit Canning Company.' That provision does not authorize the National Fruit Canning Company to place salt water or brine in said juice, if they did so."

It will readily be seen that the other instructions were directly in conflict with these.

Objection was also made to the following instruction given at the request of appellee:

"10. If you believe from the evidence that the defendant Maury Robinson, at or before the time the juice was purchased, inspected, or had an opportunity to inspect, the apple juice that was being made by the plaintiff and was shipped to the defendants, then you

are instructed that there was no warranty by the plaintiff that the apple juice was suitable or fit for vinegar, and your verdict should be for the plaintiff.

"11. If you find from the evidence that Mr. Robinson, representing the defendants, visited the plant of the plaintiff at or before the time of his making the contract in question, and observed, or had an opportunity to observe, the process employed in making the apple juice in question, the defendants cannot be heard to say that they were deceived or misled as to the character of apple juice produced by the plaintiff, and if you further find from the evidence that the apple juice shipped the defendants by the plaintiff was apple juice pressed from the peels, cores and waste of apples canned by the plaintiff in the usual and ordinary course of its business at Seattle, Washington, then your verdict should be for the plaintiff."

The contention of appellee, as before stated, is that this was a contract for the sale of a particular commodity, which appellants had an opportunity to inspect and did inspect, and that there was no implied warranty as to quality. We do not agree with counsel as to the effect of the contract, but, as before stated, we think that it was one to furnish a commodity for a particular use, and that there was an implied warranty that it was suitable for the particular use for which it was purchased, unless the purchaser actually inspected the method by which the commodity was to be produced, or was advised as to such method and what the contents of the juice would be. The rule has often been announced by this court that, where a manufacturer undertakes to supply goods manufactured by himself, to be used for a particular purpose, and the vendee has not had an opportunity to inspect the goods, there is an implied warranty that the article to be furnished is reasonably fit for the purposes for which it is intended. *Western Cabinet & Fix. Mfg. Co.* v. *Davis,* 121 Ark. 370, and cases cited. The reference in this rule to the opportunity of the purchaser

to inspect refers to the inspection of the particular article to be furnished, and not to opportunity to inspect the method by which the manufacturer produces the article. The purchaser of an article to be manufactured is not denied the benefit of an implied warranty merely because he may have had an opportunity to inspect the process of manufacture, but, if the purchaser does in fact inspect and knows at the time he makes the contract what the article is to be, there is no implied warranty. The purchaser has the right to assume, when he has had no opportunity to inspect the article itself, that it will be manufactured so as to be fit for the use for which it is intended.

There is, as before stated, a conflict in the testimony as to the extent of the inspection made by Maury Robinson, one of the appellants. According to the testimony introduced by appellee, Robinson in fact inspected the method of producing the juice, and knew at the time he entered into the contract that the juice was to be pressed out of apples which had been subjected to a solution of salt. On the other hand, Robinson testified that he did not inspect the process and did not know that the juice would be contaminated by a solution of salt.

There are many other assignments of error which we do not deem it necessary to discuss, for it is believed that what has been said in this opinion will be sufficient guide in a retrial of the cause.

For the errors indicated the judgment is reversed, and the cause is remanded for a new trial.

McCULLOCH, C. J., (on rehearing). Appellants insist that we should, for guidance in the further proceedings on remand of the cause, decide whether or not the court erred in sustaining a demurrer to the counterclaim for damages and in refusing to allow appellants to amend. We assume that the court's refusal to permit an amendment was based on the fact that the offer to amend was not made in apt time—not until the trial had been commenced. It was thus a matter of discretion, and,

since we have remanded the cause for further proceedings, it is not important to determine whether or not there was, under the circumstances, an abuse of discretion by the court. The circumstances will be different when the case goes back to the trial court, for appellants will have an opportunity to present the amendment in apt time without interfering with the preparations for trial, and it is to be assumed that the court will fairly exercise its discretion by allowing an amendment properly presenting a counterclaim. This view of the matter makes it unnecessary to determine whether or not the original counterclaim stated a cause of action.

The statute permits a counterclaim against the plaintiffs or either of them in any action for the recovery of money. *Coats* v. *Milner,* 134 Ark. 311; *Smith* v. *Glover,* 135 Ark. 531.

If appellee broke the contract, which is an issue in the case, appellants are entitled to recover any damages which, under settled principles of law, proximately resulted from such breach.